No. 25-1829

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIRST CIRCUIT

---

THE FAMILY PLANNING ASSOCIATION OF MAINE, D/B/A MAINE
FAMILY PLANNING,

*Plaintiff-Appellant,*

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F.
KENNEDY, JR., in his official capacity as Secretary of Health & Human Services;
CENTERS FOR MEDICARE & MEDICAID SERVICES; MEHMET OZ, in his
official capacity as Administrator of the Centers for Medicare & Medicaid
Services,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Maine, No. 1:25-cv-00364-LEW

---

### BRIEF OF THE NATIONAL HEALTH LAW PROGRAM AND
### NATIONAL WOMEN'S LAW CENTER AS *AMICI CURIAE* IN SUPPORT
### OF PLAINTIFF-APPELLANT AND REVERSAL

---

Martha Jane Perkins
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin St., Suite 110
Chapel Hill, NC 27514
Tel: (919) 968-6308
perkins@healthlaw.org

*Counsel for Amici Curiae*

October 29, 2025

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, *amici curiae* the National Health Law Program and National Women's Law Center state that they are non-profit organizations that have no parent corporations and issue no stock. Accordingly, no publicly held corporation owns 10 percent or more of their stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF THE *AMICI CURIAE* ......................................... 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT ............................................................................ 4

   I.   The Medicaid Act Has Long Focused on Furnishing Insurance Coverage to Women of Reproductive Age and Ensuring Their Access to Necessary Reproductive Health Care Services ................................................ 4

  II.  Congress Has Taken Many Steps to Ensure the Availability and Accessibility of Family Planning Services and Supplies ................................ 9

      A. Congress Made Coverage of Family Planning Services and Supplies Mandatory ................................................................... 9

      B. Congress Required Family Planning Services to Be Provided Free of Charge to Beneficiaries ...................................................... 12

      C. Congress Protected Managed Care Enrollees' Access to Family Planning Providers .......................................................... 13

      D. Congress Expanded Eligibility for Family Planning and Related Services .................................................................... 15

CONCLUSION ......................................................................... 18

CERTIFICATE OF COMPLIANCE .......................................................... 20

CERTIFICATE OF SERVICE ............................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, No, 1:25-cv-11913-IT,
2025 WL 2101940 (D. Mass. July 28, 2025)................................................3

**Statutes**

42 U.S.C. § 1315................................................................................16

42 U.S.C. § 1396a..............................................................................4

42 U.S.C. § 1396a(a)(10) (1965) .........................................................4

42 U.S.C. § 1396a(a)(10)(A) ...........................................................6, 7

42 U.S.C. § 1396a(a)(10)(A)(ii)(XXI)...................................................17

42 U.S.C. § 1396a(a)(10)(B) (1965) .....................................................5

42 U.S.C. § 1396a(a)(10)(G)(XVI).......................................................17

42 U.S.C. § 1396a(a)(13) (1965) .........................................................6

42 U.S.C. § 1396a(a)(14)................................................................12, 13

42 U.S.C. § 1396a(a)(23)..................................................................8, 14

42 U.S.C. § 1396a(a)(23)(B)...............................................................14

42 U.S.C. § 1396a(a)(30)(A) ...............................................................7

42 U.S.C. § 1396a(b)(2) (1965) ...........................................................5

42 U.S.C. § 1396a(e)(5) ......................................................................5

42 U.S.C. § 1396a(e)(16) ....................................................................6

42 U.S.C. § 1396a(k) .........................................................................11

42 U.S.C. § 1396a(ii)(1) ...................................................................................17

42 U.S.C. § 1396b(a)(5) ...................................................................................10

42 U.S.C. § 1396b(a)(1) .................................................................................4, 10

42 U.S.C. § 1396b(i)(26) .................................................................................11

42 U.S.C. § 1396c .............................................................................................4

42 U.S.C. § 1396d(a) (1965) .........................................................................5, 6

42 U.S.C. § 1396d(a)(1)-(32) ...........................................................................6

42 U.S.C. § 1396d(a)(4)(C) ...............................................................7, 10, 11, 14

42 U.S.C. § 1396d(a)(17) ...................................................................................7

42 U.S.C. § 1396d(a)(28) ...................................................................................7

42 U.S.C. § 1396d(b) ........................................................................................10

42 U.S.C. § 1396n ............................................................................................14

42 U.S.C. § 1396n(b) ........................................................................................14

42 U.S.C. § 1396o ............................................................................................12

42 U.S.C. § 1396o(a)(2)(D) .............................................................................12

42 U.S.C. § 1396o(b)(2)(D) .............................................................................12

42 U.S.C. § 1396o(k) ........................................................................................13

42 U.S.C. § 1396o(k)(2)(B) .............................................................................13

42 U.S.C. § 1396o-1 ........................................................................................13

42 U.S.C. § 1396o-1(a)(1) ...............................................................................13

42 U.S.C. § 1396o-1(b)(3)(B)(vii) .............................................................13

42 U.S.C. § 1396r-1c ...................................................................................18

42 U.S.C. § 1396u-2 ....................................................................................15

42 U.S.C. § 1396u-2(a)(1)(A) .....................................................................15

42 U.S.C. § 1396u-7 ....................................................................................11

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ..........6

An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14,
Pub. L. No. 119-21, 139 Stat. 72 (2025) ...........................................2, 3, 13

Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 ...........15

Consolidated Appropriations Act of 2023, Pub. L. No. 117-328,
136 Stat. 4459 ...............................................................................................6

Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272,
100 Stat. 82 (1986) ..................................................................................5, 14

Consolidated Omnibus Budget Reconciliation Act of 1986, Pub. L. No.
99-509, 100 Stat. 1874 ..................................................................................5

Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 ..............5

Deficit Reduction Act of 2005, Pub. L. No. 109-171, 120 Stat. 6 (2006) ...13

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No.
119-4, 139 Stat. 9 .........................................................................................4

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47,
138 Stat. 460 .................................................................................................4

Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360,
102 Stat. 683 .................................................................................................5

Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357 ...........................................................................14

Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330 ....................................................................5, 14

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 100-239, 103 Stat. 2106 ......................................................................5, 7

Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388 ........................................................................5

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010)..........................................................11, 17, 18

Social Security Act Amendments of 1965, Pub. L. No. 89-97, 79 Stat. 286 ...........................................................................4, 5, 6, 12

Social Security Act Amendments of 1967, Pub. L. No. 90-248, 81 Stat. 821 ......6, 8

Social Security Amendments of 1972, Pub. L. No. 92-603, 86 Stat. 1329. ......10, 12

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 ...........................................................................12

**Other Authorities**

Adam Sonfield & Rachel Benson Gold, Guttmacher Inst., *Medicaid Family Planning Expansions: Lessons Learned and Implications for the Future* (2011), https://www.guttmacher.org/sites/default/files/pdfs/pubs/Medicaid-Expansions.pdf................................................................16, 17

Ctrs. for Medicare & Medicaid Servs., *Dear State Health Official Letter #16-008* (June 14, 2016), https://www.medicaid.gov/federal-policy-guidance/downloads/sho16008.pdf..........................................................17

Ctrs. for Medicare & Medicaid Servs., *State Medicaid Manual* (1988) .................10

Dep't of Health, Educ. & Welfare, *Medical Assistance Manual* (1972)..................8

Fed. R. App. P. 29 ................................................................................1

Fed. R. App. P. 29(a)(4)(E) ...................................................................1

H.R. Rep. No. 100-391 (1987).............................................................14

H.R. Rep. No. 101-247 (1989)...............................................................7

H.R. Rep. No. 105-217 (1997).............................................................15

H.R. Rep. No. 111-299 (2009)........................................................17, 18

Jennifer J. Frost et al., *Specialized Family Planning Clinics in the United States: Why Women Choose Them and Their Role in Meeting Women's Health Care Needs*, 22 Women's Health Issues 519 (2012), https://www.whijournal.com/article/S1049-3867(12)00073-4/fulltext ...................15

Medicaid & CHIP Payment & Access Comm'n, *Report to the Congress: The Evolution in Managed Care in Medicaid* (2011), https://www.govinfo.gov/content/pkg/GPO-MACPAC-2011-06/pdf/GPO-MACPAC-2011-06.pdf .............................................................13

Melissa S. Kearney & Phillip B. Levine, *Subsidized Contraception, Fertility, and Sexual Behavior*, 91 Rev. Econ. & Stat. 137 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2815331/ ............................................16

Richard C. Lindrooth & Jeffrey S. McCullough, *The Effect of Medicaid Family Planning Expansions on Unplanned Births,* 17 Women's Health Issues 66 (2007), https://www.whijournal.com/article/S1049-3867(07)00037-0/fulltext ......16

S. Rep. No. 92-1230 (1972) ........................................................9, 10, 11

Usha Ranji et al., *5 Key Facts About Medicaid and Family Planning*, KFF (May 29, 2025), https://www.kff.org/medicaid/5-key-facts-about-medicaid-and-family-planning/ ................................................................2

# IDENTITY AND INTEREST OF *AMICI CURIAE*

The *amici curiae* file this brief pursuant to Fed. R. App. P. 29.[1] All parties have consented to the filing of this brief.

Founded in 1969, the National Health Law Program (NHeLP) advocates, educates, and litigates at the federal and state levels to further its mission of improving access to quality health care for low-income and underserved people, including those eligible for Medicaid. NHeLP has worked to ensure that Medicaid beneficiaries have access to the full range of reproductive health services, including family planning services and supplies.

The National Women's Law Center (NWLC) is a nonprofit organization that fights for gender justice in the courts, in public policy, and in our society, and works across issues that are central to the lives of women and girls, especially women of color, LGBTQI+ people, and low-income women. Since 1972, NWLC has worked to advance educational opportunities, workplace justice, health and reproductive rights, and income security. This work has included participating in numerous cases to ensure that access to reproductive health care is not restricted.

As such, NHeLP and NWLC have an interest in the outcome of this case.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel states that no counsel for a party authored this brief in whole or in part, and no party, counsel for a party, or person other than the *amici curiae* made a monetary contribution that was intended to fund its preparation or submission.

## SUMMARY OF ARGUMENT

Nationwide, the Medicaid program provides one in five women of reproductive age with coverage for a wide range of reproductive health services. Usha Ranji et al., *5 Key Facts About Medicaid and Family Planning*, KFF (May 29, 2025), https://www.kff.org/medicaid/5-key-facts-about-medicaid-and-family-planning/. These services include annual wellness exams, screening for breast and cervical cancer, testing and treatment for sexually transmitted infections, family planning services and supplies, and pregnancy care, including prenatal, delivery, and postpartum care.

In Maine, health clinics operated by Maine Family Planning (MFP) are crucial to ensuring that covered reproductive health services, as well as primary care services, are available and accessible to Medicaid beneficiaries. Indeed, MFP is the only comprehensive family planning and reproductive health care provider available to many individuals in the State. *See* JA42-43, JA47, JA52 (Decl. of Evelyn Keiltyka ¶¶ 10, 19-20, 34). In 2024, approximately half of the patients who received non-abortion services at MFP were enrolled in Medicaid. JA51 (*Id*. ¶ 30).

However, Congress has now enacted a law prohibiting select providers of abortion care from receiving any federal Medicaid funding. An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14, Pub. L. No. 119-21, § 71113, 139 Stat. 72, 300 (2025) [hereinafter "2025 Reconciliation Act"]. While Congress

intended to target and punish Planned Parenthood Federation of America and its member clinics, *see Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, No. 1:25-CV-11913-IT, 2025 WL 2101940, at *21 (D. Mass. July 28, 2025), the prohibition applies to additional providers, including MFP, *see id*. at *17 (describing the additional providers as "collateral damage").[2]

The defunding provision subverts decades of congressional action designed to increase Medicaid eligibility among women of reproductive age, enhance coverage of reproductive health services, and ensure that beneficiaries have access to the same providers as individuals with private insurance. It likewise undercuts consistent congressional efforts, beginning in 1972, to improve Medicaid beneficiaries' access to family planning services.

---

[2] Specifically, the prohibition applies to entities (including their "affiliates, subsidiaries, successors, and clinics") that: are non-profit, essential community providers "primarily engaged in family planning services, reproductive health, and related medical care;" provide abortion services in circumstances other than rape, incest, or life endangerment; and received more than $800,000 in federal and state Medicaid expenditures in fiscal year 2023. 2025 Reconciliation Act, § 71113(b)(1), 139 Stat. at 300.

**ARGUMENT**

**I.    The Medicaid Act Has Long Focused on Furnishing Insurance Coverage to Women of Reproductive Age and Ensuring Their Access to Necessary Reproductive Health Care Services.**[3]

In 1965, Congress established Medicaid, a federal-state cooperative health care program for the poor. *See* Social Security Act Amendments of 1965, Pub. L. No. 89-97, § 121(a), 79 Stat. 286, 343 (adding title XIX to the Social Security Act, known as the Medicaid Act). Under the Medicaid Act, states that choose to participate in the program must adopt a state plan for medical assistance, *id.* (codified at 42 U.S.C. § 1396a) (setting forth the state plan requirements), which must be approved by the federal government, *id.* (codified at 42 U.S.C. §1396c). The federal government then reimburses states for a portion of "the total amount expended . . . as medical assistance under the State plan." *Id.* (codified at 42 U.S.C. § 1396b(a)(1)).

In enacting the program, Congress targeted medical assistance to those whom it viewed as the most vulnerable. The 1965 law required participating states to provide Medicaid coverage to individuals who were receiving cash assistance under other Social Security Act programs, including families with dependent children;

---

[3] However, under an appropriations bill rider first passed in 1976, Medicaid does not cover abortion services in most circumstances. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, §§ 506-507, 138 Stat. 460, 616 (prohibiting the use of Medicaid funding for abortion except in cases of rape, incest, or life endangerment); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (generally making further appropriations through September 2025 under the same conditions).

aged, blind, or disabled populations were also covered. *See id.* (then codified at 42 U.S.C. §§ 1396a(a)(10), (b)(2), 1396d(a)).[4] Over time, Congress has expanded the population groups that states are required or permitted to cover, with an explicit focus on families with children and women of reproductive age specifically. For example, in a series of laws beginning in the mid-1980s, Congress de-linked Medicaid eligibility from eligibility for Aid to Families with Dependent Children (AFDC), linked Medicaid eligibility instead to the federal poverty level, and expanded coverage of children and pregnant women. *See, e.g.*, Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 2361, 98 Stat. 494, 1104; Consolidated Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9401, 100 Stat. 1874, 2050; Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4101, 101 Stat. 1330, 1330-140; Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, § 302, 102 Stat. 683, 750; Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 100-239, § 6401, 103 Stat. 2106, 2258; Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4601, 104 Stat. 1388, 1388-166. In the midst of that shift, Congress ensured that women who were enrolled in Medicaid while pregnant retained coverage during a 60-day postpartum period. *See* Consolidated

---

[4] Congress gave states the option to cover individuals who would be eligible under one of the designated public assistance programs but for their income and resources. *Id.* (then codified at 42 U.S.C. § 1396a(a)(10)(B)).

Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272, § 9501(c), 100 Stat. 82, 202 (1986) (adding 42 U.S.C. § 1396a(e)(5)); *see also* American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9812, 135 Stat. 4, 212 (codified at 42 U.S.C. § 1396a(e)(16)) (temporarily allowing states to provide continuous coverage for a 12-month postpartum period); Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, § 5113, 136 Stat. 4459, 5940 (making the change permanent).

Congress also defined medical assistance to include a comprehensive scope of benefits tailored to meet the needs of the covered population groups. Reflective of the state of medicine at the time, the 1965 law required states to cover benefits that focused on acute care, including inpatient and outpatient hospital services, laboratory and x-ray services, and physician services. Social Security Act Amendments of 1965, § 121(a), 79 Stat. at 345, 351 (then codified at 42 U.S.C. §§ 1396a(a)(13), 1396d(a)). Congress gave states the option to cover a number of additional services, including prescription drugs and clinic services. *Id*.

As with eligibility, Congress expanded the list of mandatory and optional services over time, also with a particular focus on services for children and women of reproductive age. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(1)-(32). For example, in 1967, Congress required states to cover comprehensive early and periodic screening, diagnostic, and treatment services for Medicaid-eligible children and youth under age 21. Social Security Act Amendments of 1967, Pub. L. No. 90-

248, § 302, 81 Stat. 821, 929. Congress also expanded medical assistance to require coverage of family planning services and supplies (as described below), services furnished by a nurse-midwife, and services offered by freestanding birth centers. *See* 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(C), 1396d(a)(17), 1396d(a)(28).

The 1965 law and subsequent amendments also made clear that Congress intended for Medicaid beneficiaries to have access to the same providers as individuals with private insurance. In other words, the Medicaid Act is designed to avoid providing poor individuals with second-class medical care. In contrast to other public assistance programs, Congress structured Medicaid to function as health insurance coverage. Money to purchase health services does not go directly to beneficiaries; rather, program funding goes to health care professionals who are willing to participate in the program and accept Medicaid as payment in full for any covered services they provide to beneficiaries. States must employ procedures to ensure that payment rates to participating vendors ensure efficiency and quality of care and are "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A) (as amended by Omnibus Budget Reconciliation Act of 1989, § 6402, 103 Stat. at 2260); *see* H.R. Rep. No. 101-247, at 390-91 (1989) (noting access of beneficiaries is to be

measured against "access of other individuals in the same geographic area with private or public insurance coverage," not against the uninsured population).

Moreover, shortly after creating the program, Congress recognized the need for beneficiaries to receive services from their preferred health care professionals. The Social Security Act Amendments of 1967 amended the Medicaid Act to require states to allow beneficiaries to obtain services from any "institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." § 227(a), 81 Stat. at 903-904 (adding 42 U.S.C. § 1396a(a)(23)). That provision is often referred to as the "free choice of provider" guarantee. The federal agency that administered Medicaid at the time described the purpose of the provision as "allowing title XIX recipients the same opportunities to choose among available providers of covered health care and services as are generally offered to the general population." Dep't of Health, Educ. & Welfare, *Medical Assistance Manual* § 5-100-20 (1972); *see id.* (noting the guarantee permits every beneficiary "to make his own decisions for his own reasons, free from the arbitrary authority of others").[5]

---

[5] The Department of Health, Education and Welfare was the predecessor agency to the current Department of Health and Human Services.

## II. Congress Has Taken Many Steps to Ensure the Availability and Accessibility of Family Planning Services and Supplies.

As noted above, the original Medicaid Act did not mention family planning services (although the services fell within mandatory and optional categories, such as physician, clinic, prescription drug, or laboratory services). Over the ensuing decades, however, Congress made a number of changes to the statute, with the goal of ensuring that Medicaid beneficiaries have robust access to family planning services: making coverage of the services mandatory; exempting the services from cost-sharing; allowing managed care enrollees to receive the services from out-of-network providers; and expanding eligibility for coverage of the services. With each of these changes, Congress acknowledged the unique and sensitive nature of family planning services and their critical importance to the health and livelihood of low-income individuals.

### A. Congress Made Coverage of Family Planning Services and Supplies Mandatory.

In 1972, Congress determined that its "mandate . . . that all appropriate AFDC recipients be provided family planning services ha[d] not been fulfilled." S. Rep. No. 92-1230, at 296 (1972). Despite generous federal funding to states for the services through AFDC, access remained limited, "'especially in rural areas but frequently in large urban areas as well.'" *Id*. (quoting the annual Department of Health, Education and Welfare report). In an effort to improve access, Congress

amended the Medicaid Act to mandate coverage of "family planning services and supplies furnished (directly or under arrangements with others) to individuals of child-bearing age (including minors who can be considered to be sexually active) . . . who desire such services and supplies." Social Security Amendments of 1972, Pub. L. No. 92-603, § 299E(b), 86 Stat. 1329, 1462 (adding 42 U.S.C. § 1396d(a)(4)(C)). To encourage provision of these services, Congress provided a generous 90% federal matching rate to states for "offering, arranging, and furnishing" family planning services and supplies. *Id*. § 299E(a) (amending 42 U.S.C. § 1396b(a)(5)); *compare* 42 U.S.C. §§ 1396b(a)(1), 1396d(b) (establishing general matching rates for states between 50% and 83%, with poorer states receiving more generous federal funding). While it did not define "family planning services and supplies," the legislation has long been interpreted to mean services that prevent or delay pregnancy, and at state option, services to treat infertility. *See* Ctrs. for Medicare & Medicaid Servs., *State Medicaid Manual*, § 4270 (1988) (citing S. Rep. No. 92-1230, at 297 (indicating congressional intent to provide services "to aid those who voluntarily choose not to risk an initial pregnancy" and to "families with children who desire to control family size")).

The importance of specialized family planning providers (like Maine Family Planning) to the success of these Medicaid Act amendments was clear to Congress. In describing the changes, the Senate Committee on Finance envisioned that these

clinics would contract with states to provide family planning services to Medicaid beneficiaries. *See, e.g.*, S. Rep. No. 92-1230, at 297 (noting states could provide "family planning counseling, services, and supplies, directly and/or on a contract basis with family planning organizations (such as Planned Parenthood clinics and Neighborhood Health Centers) throughout the State, to present, former, or potential [AFDC] recipients including any eligible medically needy individuals who are of child-bearing age and who desire such services").

Later, when Congress drafted the Affordable Care Act (ACA), it was careful to ensure that the new adult expansion population – non-pregnant, non-disabled adults under age 65 with income at or below 133% of the federal poverty level – would have coverage for family planning services. The law requires states to provide coverage to the adult expansion population through Alternative Benefit Plans (ABPs), Pub. L. No. 111-148, § 2001, 124 Stat. 119, 271 (2010) (adding 42 U.S.C. §§ 1396a(k), 1396b(i)(26)); *see* 42 U.S.C. § 1396u-7, and requires ABPs to include family planning services in accordance with the existing family planning provision, ACA, § 2303, 124 Stat. at 296 (requiring ABPs to include "for any individual described in section [1396d(a)(4)(C)], medical assistance for family planning services and supplies in accordance with such section").

## B. Congress Required Family Planning Services to Be Provided Free of Charge to Beneficiaries.

As enacted, the Medicaid Act allowed states to impose "a deduction, cost sharing, or similar charge" on any services other than inpatient hospital services, so long as the amount was "reasonably related" to beneficiary income and resources. Social Security Act Amendments of 1965, § 121(a), 79 Stat. at 346 (codified at 42 U.S.C. § 1396a(a)(14)). At the same time that it made coverage of family planning services mandatory, Congress amended section 1396a(a)(14) to prohibit states from charging any cost sharing for mandatory services (and to allow "nominal" cost sharing for optional services). Social Security Amendments of 1972, § 208, 86 Stat. at 1381.[6]

Congress subsequently gave states the flexibility to charge "nominal" cost sharing for mandatory services. Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 131, 96 Stat. 324, 367 (amending 42 U.S.C. § 1396a(a)(14) and adding § 1396o). However, Congress included exceptions, among them: states could not impose any cost sharing on family planning services and supplies. 42 U.S.C. § 1396o(a)(2)(D), (b)(2)(D).

The exception for family planning services and supplies has been maintained. In 2006, when Congress granted states flexibility to impose higher cost sharing on

---

[6] The prohibition on cost sharing for mandatory services applied to most, but not all, Medicaid beneficiaries. *See id*.

higher-income beneficiaries, *see* Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 6041(a), 120 Stat. 6, 81 (2006) (adding 42 U.S.C. § 1396o-1), it continued to require states to provide family planning services without any out-of-pocket costs, 42 U.S.C. § 1396o-1(b)(3)(B)(vii). Most recently, Congress amended the statute to require states to impose some level of cost sharing on some adult beneficiaries enrolled through the Medicaid expansion population group. 2025 Reconciliation Act, § 71120(a), 139 Stat. at 315 (amending 42 U.S.C. §§ 1396a(a)(14), 1396o-1(a)(1) and adding § 1396o(k), effective October 1, 2028). However, Congress once again preserved the prohibition on cost sharing for family planning services. 42 U.S.C. § 1396o(k)(2)(B).

### C. Congress Protected Managed Care Enrollees' Access to Family Planning Providers.

Congress introduced Medicaid as a fee-for-service program, meaning that states reimbursed providers directly for covered services provided to beneficiaries. The program has evolved to primarily deliver services through managed care entities. Generally, states pay managed care organizations a flat monthly rate to provide the services listed in their contracts, with the organizations in turn reimbursing their network of contracted health care providers for services furnished to enrolled beneficiaries.

Indeed, not long after Medicaid was enacted, states began experimenting with enrolling beneficiaries in managed care plans. Medicaid & CHIP Payment & Access

Comm'n, *Report to the Congress: The Evolution in Managed Care in Medicaid* 19 (2011), https://www.govinfo.gov/content/pkg/GPO-MACPAC-2011-06/pdf/GPO-MACPAC-2011-06.pdf (recounting the history of Medicaid managed care). Starting in the 1980s, Congress made a series of amendments to the Medicaid Act to allow states to require beneficiaries to receive services through various managed care arrangements. The initial changes authorized the federal government to grant waivers that allowed states to ignore the free choice of provider protection for beneficiaries enrolled in managed care. *See* Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2715, 95 Stat. 357, 809 (adding 42 U.S.C. § 1396n and amending § 1396a(a)(23) to acknowledge the potential waivers).

Soon thereafter, Congress created a carve-out to the free choice of provider waivers for family planning services. *See* Consolidated Omnibus Budget Reconciliation Act of 1985, § 9508(a)(2), 100 Stat. at 210 (amending 42 U.S.C. § 1396n(b) to prohibit restricting "the choice of the individual in receiving services under [42 U.S.C. § 1396d(a)(4)(C)]"); Omnibus Budget Reconciliation Act of 1987, § 4113(c), 101 Stat. at 1330-152 (adding 42 U.S.C. § 1396a(a)(23)(B)). These changes recognized the need to allow all beneficiaries to receive family planning services from the trusted Medicaid providers of their choice, even if those providers did not contract with their managed care plans. *See* H.R. Rep. No. 100-391, at 540 (1987), *reprinted in* 1987 U.S.C.C.A.N. 2313-1, 2313-360 (expressing

congressional intent "that there be no restrictions on access by Medicaid beneficiaries to the family planning providers of their choice," whether they receive services through a primary care case management program, an HMO, or a similar entity).[7]

In 1997, Congress gave states additional flexibility to require beneficiaries to enroll in managed care. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4701, 111 Stat. 251, 489 (adding 42 U.S.C. § 1396u-2). However, it was careful to preserve the ability of beneficiaries to receive family planning services from the providers of their choice. *See* 42 U.S.C. § 1396u-2(a)(1)(A); H.R. Rep. No. 105-217, at 847 (1997), *reprinted in* 1997 U.S.C.C.A.N. 176, 468 (explaining that, under the legislation as under then-current law, states could not restrict managed care enrollees' access to family planning providers).

### D. Congress Expanded Eligibility for Family Planning and Related Services.

In the mid-1990s, the Centers for Medicare & Medicaid Services (CMS) began to authorize states to implement experimental projects designed to expand

---

[7] Many women prefer to receive family planning services from specialized family planning providers like Maine Family Planning. *See, e.g.*, Jennifer J. Frost et al., *Specialized Family Planning Clinics in the United States: Why Women Choose Them and Their Role in Meeting Women's Health Care Needs*, 22 Women's Health Issues 519 (2012), https://www.whijournal.com/article/S1049-3867(12)00073-4/fulltext; JA52 (Decl. of Evelyn Keiltyka ¶ 33); JA35-36 (Decl. of Cassidy Jarvis ¶ 3).

eligibility for coverage of family planning services. Adam Sonfield & Rachel Benson Gold, Guttmacher Inst., *Medicaid Family Planning Expansions: Lessons Learned and Implications for the Future* 3-4 (2011), https://www.guttmacher.org/sites/default/files/pdfs/pubs/Medicaid-Expansions.pdf [hereinafter "Sonfield & Gold"]; *see* 42 U.S.C. § 1315 (giving the Secretary of Health and Human Services the authority to waive certain Medicaid Act requirements to enable a state to carry out an "experimental, pilot, or demonstration project" that is "likely to assist in promoting the objectives" of the Act). Generally, the projects provided family planning coverage to women who were not otherwise eligible for full-scope Medicaid coverage and had income below the income eligibility level for pregnant women. Sonfield & Gold at 3-4. Between 1997 and 2011, CMS approved such projects in 22 states. *Id.*

Extensive research showed that the projects were a success. They increased use of contraception generally and of the most effective methods of contraception specifically. *Id.* at 14. They prevented unintended pregnancy and pregnancy among adolescents; in addition, they helped women improve their pregnancy spacing, which is associated with better maternal and child health outcomes. *Id.* at 15-19; Melissa S. Kearney & Phillip B. Levine, *Subsidized Contraception, Fertility, and Sexual Behavior*, 91 Rev. Econ. & Stat. 137 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2815331/ (finding Medicaid family

planning expansions reduced births among "non-teens" by 2% and births among "teens" by 4%); Richard C. Lindrooth & Jeffrey S. McCullough, *The Effect of Medicaid Family Planning Expansions on Unplanned Births,* 17 Women's Health Issues 66 (2007), https://www.whijournal.com/article/S1049-3867(07)00037-0/fulltext (finding family planning expansions lowered average annual birth rates). By averting Medicaid-funded births, the projects led to cost savings for states and the federal government. Sonfield & Gold at 19.

With this research in hand, Congress made expanded eligibility for family planning services a permanent feature of the Medicaid program in the Affordable Care Act. *See* H.R. Rep. No. 111-299 pt. 1, at 616 (2009) (in explaining the proposed change, pointing to the success of the section 1115 projects in "reducing the incidence of unwanted births and improving the health of low-income women"). Congress gave states the option to provide coverage of family planning and family planning-related services to individuals who are not pregnant and who have household income below the highest income eligibility level established under the state plan for pregnant women. ACA, § 2303(a), 124 Stat. at 293-294 (codified at 42 U.S.C. § 1396a(a)(10)(A)(ii)(XXI), 1396a(a)(10)(G)(XVI), 1396a(ii)(1)); *see* Ctrs. for Medicare & Medicaid Servs., *Dear State Health Official Letter #16-008* at 1 (June 14, 2016), https://www.medicaid.gov/federal-policy-guidance/downloads/sho16008.pdf (explaining that family planning-related services

are "medical, diagnostic, and treatment services provided pursuant to a family planning visit" and include treatment of a medical condition "routinely diagnosed during a family planning visit . . . preventive services routinely provided during a family planning visit . . . or treatment of a major medical complication resulting from a family planning visit").

Also as part of the ACA, Congress gave states the option to provide presumptive eligibility to this new population group. § 2303(b), 124 Stat. at 294-95 (codified at 42 U.S.C. § 1396r-1c). This means that states can provide immediate coverage to individuals who appear to meet the eligibility criteria based on preliminary information provided to their health care provider. *See* H.R. Rep. No. 111-299 pt. 1, at 616 (noting "[t]he purpose of this option is to avoid any delay in the provision of services to women at risk of unwanted pregnancy").

## CONCLUSION

Over the 60-year history of the Medicaid Act, Congress has repeatedly enacted provisions to ensure that low-income women have access to a wide array of reproductive health services, including family planning services from the providers of their choice. The defunding provision in the 2025 Reconciliation Act dramatically undermines this progress, threatening the health of Medicaid beneficiaries. For the foregoing reasons, the *amici curiae* ask that this Court reverse the district court's decision.

Dated: October 29, 2025              Respectfully submitted,

/s/ Martha Jane Perkins
Martha Jane Perkins
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin St., Suite 110
Chapel Hill, NC 27514
Tel: (919) 968-6308
perkins@healthlaw.org

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

As required by Fed. R. App. P. 32(g), I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5), and that the total number of words in this brief is 4,031 according to the count of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

/s/ Martha Jane Perkins
Martha Jane Perkins

**CERTIFICATE OF SERVICE**

I certify that on this day, October 29, 2025, I electronically filed the forgoing brief with the Clerk of the Court by using the CM/ECF system.

/s/ Martha Jane Perkins
Martha Jane Perkins